By the Referee.
On the 6th day of February, 1885, the defendants, Annabella McO. Kaughran and Mary E. McNamara were seized .of the premises described in the complaint in this action in equal shares as tenants in common. On said date and on the 18th day of April, 1885, they executed instruments (hereafter particularly referred to) transferring to each of their brothers, Nicholas Albert McOool and John B. McOool, one-fourth of the proceeds of a contemplated sale of said premises, or of the surplus moneys to arise if the same were sold under decree in the present action then pending. Thereafter and on the 25th day of September, 1885, said Annabella McO. Kaughran and Mary E. McNamara (then Mary E. McOool) executed a contract in writing with Francis M. Jencks, in and by which they agreed to sell and convey said premises to him on the 1st day of November, 1885, for a consideration of $10.500. Said contract also contained the following provision : ‘ ‘And the said party of the second part further agrees that in case the said premises should be sold at public sale in the foreclosure suit now pending against the same, before the delivery of the deed *123 as herein provided, he will bid on said premises to the amount of $10,500 at such sale; and the said parties of the first part hereby agree that if said premises shall be sold in said foreclosure suit as aforesaid for any greater sum than $10,500, the surplus shall belong to the said party of the second part.”
On the 15th day of October, 1885, said premises were sold under decree of foreclosure herein, at public auction, to said Francis M. Jencks, for $12,200. Such purchaser refused to •complete his purchase, and on or about the 2d day of January, 1886, a motion was made to compel him to so complete, which motion was denied, and the order thereupon entered further directed a resale of the property, and that the ten per cent of the purchase money paid by said Jencks, on the day of the first sale, be repaid to him, together with lawful interest thereon, and the amount of the auctioneer’s and exchange fee, and the further sum of seventy-five dollars which was thereby “allowed to said purchaser for his •expenses in examining the title to the said premises,” besides costs of the motion. A resale was accordingly had on the 27th day of January, 1877. Said Jencks attended and bid $10,500, the amount or price named in the said contract of sale. The property was struck down to another purchaser for $11,900, who completed his purchase. The terms of the decree herein were complied with, and the referee, after making all payments provided for by the judgment, and also those to said Francis M. Jenck, directed by ;said order of January 2, 1886, deposited the surplus moneys arising on such second sale with the chamberlain of the city of New York. This proceeding is brought for a distribution of the surplus moneys among the persons entitled thereto.
The first claim requiring consideration is that of said Francis M. Jencks, who contends that although he refused to complete his purchase on the first sale, yet as he bid the sum mentioned in the contract at the second sale, he is "under said contract entitled to the difference between the contract price, $10,500 and $11,900, the amount realized on the second sale. In an ordinary case, if the question of title is raised, either in an action for specific performance, or upon a motion in a foreclosure or partition suit, the relief the vendee asks is that he be released from his contract. In other words, he requests that the contract be annulled. If one party is freed from the obligation, the other party, though in fault, is also necessarily discharged from performance. If the vendee is let out of his liability he loses his rights under the contract, for the contract is extin-guished. The vendee may claim and be allowed outside of the contract his damages, which are usually his disburse *124 ments. and a reasonable fee for searching the title. I cannot see that the case at bar fails outside of the rule above stated. According to. a fair and reasonable construction, the contract may be viewed as "an alternative one, giving the vendee the option to purchase at an agreed price,, either at private sale or at pubhc auction. The latter contingency happened. He bid at the foreclosure sale an amount in excess of the agreed price, and if he had carried out the contract he would have been entitled thereunder to such excess. He now claims that in failing to complete he did not refuse to comply with the contract, but only with the terms of sale in the foreclosure suit. But this view cannot prevail. His contract bound him to purchase at the auction sale, “in the foreclosure suit now pending.” This provision was as essential a part of the contract as the other alternative engagement to take a deed directly from the parties. In declining to comply with the terms of sale he therefore necessarily declined to perform the contract. Moreover, upon the motion which relieved him from his bid, he raised an objection, which went to the question of title generally, and which would have been equally a ground of objection if he were taking the property at private sale.
In the terms of sale it was stated that the land to be sold included a portion of the old Bloomingdale road that “ such portion is about twenty-three feet front by the depth* of the parcel, and that inasmuch as question has been raised to the title of such portion, purchasers are notified that, as to so much of the property as formerly constituted-a part of said road, the purchaser will take the same subject to any question of title by reason of the matters aforesaid.” when the purchaser came to examine the title it-was discovered that the portion heretofore forming part of the Bloomingdale road was about thirty-three feet instead of about twenty-three feet, and he insisted that the discrepancy of ten feet between the amount as stated in the notice and the actual amount was sufficient to release him from his bid. This objection went deeper than the correctness or binding force of thefterms of sale. If he considered the title good it was immaterial whether the exact number of feet was stated in the notice or whether any notice was-given at all. It cannot now be argued that perhaps the court relieved him on other grounds. Without going into the alleged defects in the foreclosure proceeding, it is evident that the objection considered, as raised by Mr. Jencks in the capacity of an ordinary purchaser at the auction and a stranger to the title, must, have been a serious and potent one. The court gave no opinion, and it would be impossible and is unnecessary to determine which of the points presented had greatest weight. The purchaser formally took *125 the position that the title was doubtful, and that the notice was insufficient to compel him to take it such as it was. The court held in his favor, without stating the particular reasons for the decision. Certainly he is now estopped from denying that the court did decide the motion on this ground. I am of opinion, therefore, that this decision, relieving the purchaser from his bid and awarding him damages, which he has accepted, operated under the facts of this case to annul the contract.
It follows that Mr. Jencks has no legal standing in court, and it seems even clearer that his claim has no foundation upon anything like equitable grounds. It is difficult to explain his appearance and bid at the second sale on any other theory than that of an attempt, by observing the mere letter of a contract, to save any technical rights which might be found to accrue. The property was struck down to him at the first sale, and if he had really wanted it he might then have complied with the contract according to its spirit and true intent. Instead of this he rejected the title, and not only procured his own release, but put the estate to the delay and expense of a second sale, and the additional expense of the damages he himself recovered. It was suggested that Mr. Jencks might be perfectly willing to take the title with its doubts for the contract price, but that he could not afford to accept it after he had discovered the flaw at the larger sum bidden at the first auction. But, protected as he was by the contract,, how could the property stand him in more than the contract price ? If the lots sold for more than this he was to receive the excess, and, if he had completed, the transaction would have been equivalent to taking money out of one pocket and putting it into another.
The two instruments executed by Mrs. Kaughran and Mrs. McNamara, as parties of the first part, to John B. McCool and Nicholas Albert McCool, their brothers, respectively assigned in the first place to each of said brothers a one-quarter interest in the net proceeds of the property, at a contemplated private sale, after deducting various expenses specified. The words used in this clause are 4 ‘ assign, transfer and set over.” Secondly, they provided that upon any conveyance under foreclosure of mortgage “the said parties of the first part will allow, out of the surplus moneys decreed to be paid to the parties respectively entitled thereto, one-fourth part of said surplus moneys, to be paid” to each of the parties of the second part. The so-called “ preliminary agreement ” of April 17th, which provides generally for “transfer from Mrs. Kaughran and Mary E. McCool, to Nicholas Albert McCool, of a quarter interest in the proceeds of the so-called One Hundredth street lots,” *126 was not executed until after the instrument under which John B. McCool’s rights accrued. But it shows that the intention, so far as Nicholas Albert is concerned, was a general transfer of the proceeds. The instrument of April 18th, by which Nicholas Albert acquired his rights, must, certainly be read in connection with the ‘ ‘ preliminary agree - ment,and it may fairly be inferred from the two in conjunction that the purpose as to him was an assignment of the surplus moneys as well as the net proceeds. The document of February 6, 1885, by which John B. McCool’s interest arose, was in phraseology identical with that to. Nicholas Albert. Mr. Lane’s testimony (elicited without objection, page 7) is to the effect that both of these instruments were a part of one scheme of settlement of a litigation between the parties in relation to this property; that in the course of that settlement John B. and Nicholas A. claimed the same shares, and that it was conceded by all concerned that their shares were the same. Viewing this, evidence altogether, the intention to assign seems, both with regard to John B, and Nicholas A., to apply as much to the surplus moneys in the event of foreclosure as to the net proceeds in case of a private sale. The consideration was ample to support these papers as equitable assignments, and in equity the brothers respectively, or their assignees, are entitled to such portions of said surplus moneys as the instruments declare. Formerly it was held that a referee in surplus proceedings could only consider the strictly legal status of claims presented. But it has been decided in Bergen v. Carman (79 N. Y., 146), that such referee may allow hens to be attacked for fraud and try the question of their validity. In Tator v. Adams (20 Hun, 131) it was held that a referee in surplus proceedings may entertain an application to reform an instrument on equitable grounds, and give it its effect as a hen after its reformation. See, also, Halstead v. Halstead, 55 N. Y., 442. It is but to follow the principles and reasoning of these later cases legitimately a step further to hold that a referee may take cognizance of equitable conveyances of the land or equitable assignments of the surplus moneys, and by reporting directly in favor-of the equitable assignee _ save circuity of action. This course is especially proper in an instance like the present where no one attacks or asserts any rights in contravention of the instruráents themselves. They are conceded by all to stand for what they contain, and the only controversy is as to their interpretation—the determination of how far they go and what rights they confer.
These instruments provide for two contingencies: In the-event of a sale by private contract, the parties assign one-fourth of the “net proceeds ” to each brother, and the doc *127 uments expressly define “net proceeds*' as allowhigto the parties of the first part “certain sums of money theretofore advanced by them to improve ' the property, all existing liens and certain expenses theretofore incurred in searching title and negotiating sale. But in the event of foreclosure, which is the second contingency., each brother was to receive one-fourth of the “surplus moneys” The second contingency happened, and it is claimed, on behalf of the sisters, that, viewing the instruments as a whole, it was the intention that the various sums advanced and expenses incurred should be repaid to them before dividing the surplus moneys, in the manner prescribed m the first clause for a deduction from the proceeds before a division, in the event of a private sale. But. there is nothing m the documents to throw any additional hght on the intention If there were a reel • tal, or other provision, from which it could be mferred that they had m mind the allowance of these amounts in either event, the argument would have weight. As it is, the two contingencies are distinctly separated. If a private sale took place, the “net proceeds” were to be divided, and the term is clearly defined. If a, sale in foreclosure occurred, the “surplus moneys"’ were to be divided, and no special definition of the latter phrase is given. ; • There are very many words and phrases which have one meaning in ordi • nary narration or composition, and quite another when they are used as technical words in relation to some special subject; and it is obvious that if this be the subject matter of the contract, it. must be supposed that the words are used in this specific and technical sense. ” Parsons on Contracts, vol. 2, marginal page 499; see also cases there cited, and Barquit v. Orient Mut. Ins. Co.. 3 Bosw., 385. The term “surplus moneys*'has, in connection with a foreclosure suit, as it is here used, a well defined meaning.
These instruments were drawn by a member of the bar who was familiar with the technical sense of the language employed. The intent of the parties can of course be drawn only from the instruments in which they chose to embody it, and they provide clearly for the payment of one-fourth of the surplus moneys to each of the brothers, without any previous allowance to the sisters.
This is not a mere question of the technical construction of a writing. Previous to the execution of these papers, the parties had been hi litigation over this property, in which the brothers claimed that they were entitled of right, each to a quarter interest. The sisters had the legal title to the whole, and they had incurred these expenses for improvements, etc., upon their own responsibility, and acting as sole owners. When the compromise was arrived at the brothers agreed in consideration of the settlement that cer *128 tain deductions should be made from their shares. How can we say that they did not m. fact intend to consent that in the event of a private sale a portion of these moneys should be reimbursed out of their shares, but that, if a foreclosure suit with its additional charges were carried through, they would allow nothing but the regular deductions in such a proceeding to be made ? Under the contract as it stands some of the items enumerated in the first clause, i. e., taxes and interest on existing mortgage have been deducted in arriving at the ‘ ‘ surplus moneys. ” How could it be decided that John B. and Nicholas A. McCool did not actually have in mind that, under the second contingency provided for, only these expenses and those of the suit should diminish their shares % Such at least is the legal effect of the documents and, as before stated, they were prepared by a lawyer who presumably expressed the real purpose of the parties in legal phrase.
The fact that portions of the sums expended were payments made to the brothers for work and services in and about the property in the sisters' employ is immaterial, because the instruments above referred to were executed after such work and payment. I shall accordingly report that John B. McCool and Nicholas A. McCool or their respective assignees are each entitled to a full fourth part of the fund. , Mrs. Kaughran claims that she must at least be allowed as between herself and the grantee of Mrs. McNamara, the latter’s proportionate share of the aggregate amount expended on their joint account for improvements upon the property and in endeavoring to consummate a sale thereof.
The case of Taylor v. Baldwin (10 Barb., 627, 582) is against the contention that an equitable lien arose ipso facto from Mrs. Iiaughran’s paying more than her share of the expenses. It is there held that a tenant in common, who makes advancer and payments beyond his proportion towards the erection of buildings will not thereby acquire an equitable lien upon the property, unless there is an express agreement to that effect or there are some peculiar equities, that the doctrine of 'constructive Hens wiH not at this day be extended, and that secret trusts and constructive Hens upon real estate are not to be encouraged. This is a carefully considered case, and I cannot discover that it has been overruled or questioned. In Prentice v. Janssen (79 N. Y., 489) it was brought to the attention of the court, and in the opinion is declared to be not adverse to the views there expressed. We must therefore regard Taylor v. Baldwin as a controlling authority on the question here involved, and it is therein held that, in order to create an equitable Hen upon land there must be not simply an express agreement to pay the debt, but an' express agreement *129 that the co-tenant shall have a lien. Of course the nature and extent of the lien will depend on the terms of the agreement. The only testimony offered on this point is the following by Mrs. Kaughran:
“Q. You have heretofore testified that in or about the month of September, 1884, you had certain conversations with Mrs. McNamara in reference to the payment of certain of the claims then existing against the property in question in this suit; will you kindly state those conversations 2 “A. She stated that she was willing to pay her share of the debts, and that as soon as the property was sold that money should be taken out first and the debts paid.
“ Q. Did she request you to make such payments at that time, and agree that it should be paid out of the proceeds of that property prior to distribution 2 “A. Yes, she did.
“ Q. And you advanced those various amounts you have heretofore testified to, under that representation from her 2 “A. Yes.”
It seems perfectly plain that this agreement would not, in any event, create ao Men upon the land itself. It appHes only to the proceeds of the land after sale, and could have no effect whatsoever until the land had been sold. In this it follows the analogy of the other agreements made by the parties. They aE looked towards a sale and the rights, conferred inter sese were in every instance in the proceeds. Having a sale in view, it is not to be presumed that there was an intention to create Mens which would be incumbrances on the realty. Under these circumstances, and in order to construe this contract, I do not think such proceeds should be considered land, or subject to its incidents. A conversion .from realty into personalty was expressly contemplated, and, therefore, the Men or charge created (if any) was upon a personal fund expected to accrue.
A question would arise whether this conversation would have been sufficient to create an equitable Men even in such proceeds. It is weE settled law that an agreement “to pay a debt out of a designated fund does not give an equitable Men upon the fund, or operate as an equitable assignment thereof.” Williams v. Ingersoll, 89 N. Y., 508; Rogers v. Hosacks’ Executors, 13 Wend., 319; Christmas v. Russell, 14 Wall., 69; Trist v. Child, Slid., 441.
It is by no means clear that the verbal agreement to which Mrs. Kaughran testifies would not faE within the rules estabMshed by these cases. But this question I am not caEed upon to decide. By mesne conveyances the interest of Mrs. McNamara (formerly Mary E. McCool) in the real estate was conveyed to L. Edgar Aron, Esq., the day before the *130 foreclosure sale for an expressed consideration of $500. Mr. Aron’s title has not been in any manner attacked. No attempt has been made to show that he bought with knowledge of the facts, and is chargeable with all equities between, the parties, or that his deed, though reciting a valuable consideration, was in reality a voluntary conveyance.
He maíces no claim in contravention of the equitable-assignments of February 6th and April 18th, 1885, to John B. and Nicholas A. Mcdool. which are recorded, but insists that, as between Mrs. Kaughran and himself, Ms rights are those of a purchaser for value without notice. Under the facts proved I cannot conclude that a lien was established on the land, and moreover, it is further held in Taylor v. Baldwin that where creditors have secured the legal title to-property upon which a secret and constructive lien is claimed, without notice of such lien, they will hold the property as against the person claiming such hen by virtue of their prior and superior legal title. The position of a bond fide purchaser for value is certainly as strong a one legally as that of a creditor, and upon both grounds it must be held that no hen exists as against Mrs. McNamara’s grantee.
I shah, accordingly, find for a division of the surplus moneys in equal shares between Mrs. Kaughran, the grantee of Mrs. McNamara, and the assignees respectively of John B. and Nicholas A. McOool, and shah report ah the facts prpved, so that, if I am incorrect in my conclusions, the court may make a final order for distribution without a. rehearing.
Sedgwick, G. J., confirmed the report on the opimon of the referee. ✓